J-S03042-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1418 WDA 2019 |

Appeal from the Order Entered August 14, 2019
In the Court of Common Pleas of Beaver County Juvenile Division at
No(s):  3014 of 2019

BEFORE:  McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED FEBRUARY 19, 2020**

C.R. (Mother) appeals from the order of the Court of Common Pleas of
Beaver County (trial court) involuntarily terminating her and B.D.'s (Father,
collectively Parents) parental rights to I.D. (Child).[1]  We affirm.

## I.

### A.

We take the following background facts and procedural history from our
independent review of the record.  Upon Child's birth in November 2018, Beaver
County Children and Youth Services (BCCYS) filed an Application for Emergency

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father has appealed separately at docket number 1421 WDA 2019.

Protective Custody and Dependency Petition based on a referral from Florida where, before Child's birth, Mother and Father voluntarily terminated their parental rights to Child's two older siblings.[2]  One of the siblings, A.D., was the victim of serious physical injuries determined to have been caused by the Parents.  The injuries included 28 fractures within the first 30 days of her life.  (***See*** N.T. Hearing, 7/01/19, at 27-28).  P.D., Child's other sibling, suffered from failure to thrive.  (***See id.*** at 26).

After a shelter hearing, Child was placed in a foster home on November 21, 2018.  At the adjudicatory hearings, BCCYS presented the testimony of Dr. Shilpa J. Sulochana, the Florida pediatrician who treated A.D. and P.D.; a Florida caseworker; and S.M and T.M., the family that adopted A.D. and P.D. and was the adoptive resource for Child as well as another treating pediatrician.  (***See id.*** at 9).  The court left the record open for Parents to obtain medical records and an expert witness, but they failed to do so.  The record was closed in January 2019.

On February 28, 2019, the court filed an Aggravated Circumstances Order that found that Child was the sibling of a victim of physical abuse and that no services were to be provided for reunification other than visitation.  On April 25,

_____

[2] Mother and Father moved from Florida in July 2018 when Mother was pregnant with Child. (***See*** Trial Ct. Op., 10/11/19, at 8).

2019,[3] the court entered an Order of Adjudication and Disposition finding the Child to be dependent, set the initial goal as adoption, and directed that no BCCYS services were to be provided other than visitation due to the finding of Aggravated Circumstances. The orders contained detailed findings of fact regarding the injuries suffered by Child's siblings and specifically found that Mother and Father were the perpetrators of the abuse. On March 28, 2019, the court denied the motion for reconsideration filed by Mother and Father. Neither Mother nor Father appealed from the Aggravated Circumstances Order or the Order of Adjudication and Disposition.

**B.**

BCCYS filed a Petition for the Involuntary Termination of Parental Rights (TPR) pursuant to 23 Pa.C.S. § 2511(a)(2). At the TPR hearing, BCCYS moved to admit all of the previously entered orders, including their extensive findings of fact, and the trial court expressly identified each one and admitted it into the record. (**See** N.T. Hearing, at 9-11). BCCYS family caseworker, Jennifer Gengarella, and foster caseworker, Erin Clark, testified on behalf of BCCYS.[4] Mother and Father testified on their own behalf and presented the testimony of

---

[3] An amended Order of Adjudication and Disposition was filed on March 11, 2019, due to a technical error.

[4] The testimony presented by BCCYS was limited because of the trial court's order that previously set the permanency goal to adoption and directed BCCYS not to provide services to the family other than visitation. (**See** BCCYS's Brief, at 5).

Shannon Best, the Project Star employee who supervised their visitation with Child and Paternal Grandmother.

Ms. Gengarella testified that neither Mother nor Father had ever provided an explanation to her to explain the injuries sustained by A.P. (*See id.* at 15-16). She stated that BCCYS believed Child would not be safe in the care of Mother and Father because she was too young to protect herself and the "egregious nature" of A.D.'s injuries. (*Id.* at 16). The caseworker explained that if BCCYS had been ordered to provide services, it would have been difficult to determine what services would be necessary to address the safety concerns with Mother and Father because they never explained the injuries. (*See id.*). She was not aware of any services that Parents had sought on their own other than the initial evaluation offered by BCCYS. (*See* 39-42).

As to the family finding efforts for Child's placement, Ms. Gengarella testified that prior workers did extensive searches and had spoken to many Florida relatives who were unable to take Child. (*See id.* at 19-20). Mother and Father only provided her with Paternal Grandmother as a possible placement resource but BCCYS ruled her out because Parents lived with her, and she did not complete the requirements of an interstate investigation relative to A.D. and P.D. (*See id.* at 29-30). In addition, the court previously had ruled Child was not to be placed with Paternal Grandmother absent a subsequent order, and Mother and Father neither appealed that ruling nor brought a subsequent motion to place Child with Paternal Grandmother. (*See id.* at 62-63, 141-42).

Ms. Gengarella testified that she went to Florida and personally investigated S.M. and T.M., the adoptive parents of Child's siblings. (*See id.* at 22). She testified to the appropriate nature of the home as well as her observations of the interactions between Child, S.M. and T.M., and Child's biological siblings, A.D. and P.D. (*See id.* at 22-23). She found that S.M., T.M. and Child's siblings were loving toward Child and that Child responded well to them. (*See id.*). S.M. and T.M. are willing and have expressed a desire to adopt Child. (*See id.* at 17).

As to the bond between Child and Mother and Father, Mother and Father acted lovingly towards her at visitations. (*See id.* at 21). Ms. Gengarella testified that Child is a very happy baby who smiles at everyone, including her Parents. (*See id.*). She was unable to testify as to whether there is a specific bond between Child and either Mother or Father. (*See id.*).

The foster care caseworker, Erin Clark, testified that Child is doing "remarkably well" in her Pennsylvania foster home and that she has bonded with her foster family. (*Id.* at 58; *see id.* at 60-61). She also testified that in her limited observations of Child with Mother and Father, the Parents had been appropriate and loving. (*See id.* at 61).

S.M., the adoptive mother of Child's siblings and Child's permanency resource, testified that she and her husband, T.M., are willing and able to adopt Child and are excited to do so. (*See id.* at 73-75).

Project Star employee Shannon Best testified that Parents attend nearly every visit with Child offered to them. (*See id.* at 78). She stated that she observed most of the visits, that they go very well, the Parents are appropriate, and Child responds to their voices. (*See id.* at 79-81). Ms. Best testified that the Parents are appropriately cautious with Child and do not get angry with her. (*See id.* at 87-88). She said that there was a bond between the Parents and Child, who is easy going and loving, but that Child also responds well to her, and that Child is bonded with the Pennsylvania foster family. (*See id.* at 82-86).

Both Parents testified that they love Child, but did not identify any services he or she had completed during the pendency of the juvenile matter, although Mother stated that she would be willing to attend classes. (*See id.* at 98, 110, 120). The trial court observed that Father's demeanor was angry and that he did not express any parental feelings for the pain suffered by A.D. and P.D. He stated that Child was the only one of his children with whom he had any type of bond. (*See id.* at 97). Paternal Grandmother testified that the Parents interact well with Child. (*See id.* at 137).

On August 14, 2019, the trial court entered an order terminating the parental rights of Mother and Father. Mother timely appealed.[5] She and the court complied with Rule 1925. *See* Pa.R.A.P. 1925.

_____

[5] Our standard of review of this matter is well-settled:

**II.**

Mother argues that the trial court erred in terminating her parental rights because (1) [BC]CYS failed to provide clear and convincing evidence that Mother cannot or will not remedy the incapacity, abuse, neglect or refusal, pursuant to 23 Pa.C.S. § 2511(a)(2), and (2) it failed to consider the parent-child bond pursuant to Section 2511(b).  (**See** Mother's Brief, at 6, 13-20).

**A.**

We initially turn to Mother's first argument, "CYS failed to present evidence that Mother had a current inability that could not be remedied in order to parent Child, but instead relied wholly upon Mother's involvement with prior children in Florida proceedings."  (Mother's Brief, at 14).

---

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In a termination proceeding, the moving party must produce clear and convincing evidence[6] with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2):[7] (1) repeated and continued

_____

[6] Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re D.L.B.**, 166 A.3d 322, 326 (Pa. Super. 2017) (citation omitted). The trial court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). **Id.**; **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

[7] Section 2511(a)(2):

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See id.* "[A] court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child [because] [i]f the statute required physical custody as a prerequisite, termination of parental rights would only result after a child has suffered physical, emotional or mental damage." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations omitted).

> [W]hen a parent has demonstrated a continued inability to conduct [her] . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* (citation omitted).

Finally, we observe that The Juvenile Act, 42 Pa.C.S. §§ 6301-6365, controls the adjudication and disposition of dependent children. The policy aim

underlying The Juvenile Act is to prevent children from remaining in foster care indefinitely, which causes the children to lack permanency, normalcy and long-term parental commitment. *See In re C.B.*, 861 A.2d 287, 295 (Pa. Super. 2004), *appeal denied*, 871 A.2d 187 (Pa. 2005). The aggravated circumstances provision "advanced the process by requiring the court, after hearing and finding the existence of aggravated circumstances to directly order termination of parental rights and change the goal to adoption." *In re Adoption of A.M.B.*, 812 A.2d 659, 667 (Pa. Super. 2002). Under the Act, "aggravated circumstances" includes, in pertinent part: "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302.

As explained by the Court in *In re A.M.B.*:

Once the agency in an involuntary termination proceeding establishes that the elements of abuse, abandonment and/or neglect have been proven by clear and convincing evidence, the child has not been reunited by reasonable efforts and time, and/or aggravated circumstances of a previous effort with the family establish sufficient bases for termination, the agency will prevail. . . .

*In re A.M.B.*, *supra* at 671.

Here, the trial court found that the Parents physically abused Child's sibling, A.D., resulting in 28 broken bones in a 30-day period. It ruled that aggravated circumstances existed as to the Child based on that physical abuse, specifically finding that the abuse resulted in serious bodily injury and/or aggravated neglect to the siblings. It then immediately changed the goal to

adoption. Parents did not appeal this aggravated circumstances order and it was admitted into evidence at the TPR proceeding. Because of these aggravated circumstances, the trial court properly exercised its discretion in granting BCCYS's petition for involuntary termination of the Parents' rights to Child. **See id.**

## B.

Mother argues, however, that the record does not support a finding that she is **currently** unable to provide proper care because she took the siblings to the doctor in Florida, moved to Pennsylvania for a "lifestyle-change," and acted lovingly and appropriately toward Child during visitations. (**See** Mother's Brief, at 14-16). However, the record reflects that the Parents did not complete any services that would have addressed the safety risk posed by the sibling's unexplained injuries or offer any testimony that would support a finding that Child would be safe in their care. It is well-settled that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **See In re Z.P.**, **supra** at 1121.

Further, the Parents were required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See In re A.L.D.**, **supra** at 340. Here, although Mother maintains that she contacted the organization that performs parenting evaluations, she did not offer any evidence that she consulted any other professional to assist her in addressing her parenting shortfalls that led to the abuse of her other children. In fact, the

record reflects that neither of the Parents demonstrated any accountability and they have not completed any services to address the abuse issues. The fact that they fail to recognize that their own misconduct resulted in harm to their other children evidences that the abuse cannot or will not be remedied.

Based on the foregoing, the record supports the trial court's finding that the clear and convincing evidence established that repeated incapacity, abuse, neglect or refusal caused Child to be without essential parental care necessary for her physical or mental well-being, and that the causes of repeated and continued incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re M.E.P.*, *supra* at 1272.

**C.**

Next, we turn to Mother's claim that the court failed to adequately consider the parent-child bond. (*See* Mother's Brief, at 17-20). Mother maintains that the trial court did not conduct an adequate bonding evaluation where the record supports a finding that a bond exists. (*See id.*). Specifically, she challenges the court's finding that Child's bond with Mother is similar to the one she shares with others, that severing the relationship between them would not have a detrimental effect on Child, and that the court gave too much weight to Ms. Gengarella's testimony, which was equivocated. (*See id.*).

Section 2511(b) of the Adoption Act "focuses on whether termination of parental rights would best serve the developmental physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324

(Pa. Super. 2010). "Section 2511(b) does not explicitly require a bonding analysis, and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citation omitted).

Here, the trial court explained:

> . . . The Child is thriving while being cared for by their current foster family. The Child's needs are being met in the current foster placement and when the Child is in the care of T.M. and S.M. The Child is bonded with the current foster family, T.M., S.M., and her two half-siblings in Florida. The Child has adjusted well to the two prospective adoptive homes.
>
> The [c]ourt acknowledges that the Mother loves the Child and that the Child does have a bond with Mother. However, the bond with Mother is similar to others with whom the Child is familiar. The Mother has no special bond with the Child for which the Child would incur harm if it was severed.
>
> The [c]ourt also acknowledges that Father also has a bond with the Child that is similar to others with whom the Child is familiar. The Father has no special bond with the Child for the Child would incur harm if it was severed. The only testimony provided that the Child has a bond in excess to that of a typical bond with someone the Child is familiar was provided by the self-serving testimony of the Parents. The Child's bond with the Parents is not such that the

severance of the bond with either Parent would have a detrimental effect on the Child.

. . . The [c]ourt finds that the safety of the Child would be severely at risk if the Child were to be returned to the care of the Parents. The Parents did not provide any credible explanations for the injuries to A.D. The Parents refused to acknowledge that P.D. was diagnosed with failure to thrive. The Parents did nothing to identify what caused such parenting failures and failed to accept that the injuries or illnesses were the result of their actions. The Parents did not ever take any responsibility for the abuse sustained by either child and have consistently refused to recognize their own roles in the situation as it exists today.

Furthermore, on multiple occasions the court determined that [Child] could not safely be within Mother and Father's care. The BCCYS caseworker, Jennifer Gengarella, unequivocally and credibly testified that [Child's] needs and welfare would be best served by the termination of her parents' parental rights. (**See** TPR Hearing, at 24).

(Trial Ct. Op., at 22-24) (record citation formatting and some capitalization provided).

Contrary to Mother's assertions, the record supports the trial court's observations. Although Mother loves Child and both she and Father have a bond with Child, the trial court did not find Mother and Father's testimony regarding the extent of their bond with Child to be credible. (**See id.** at 13). We are required to accept this credibility determination where it is supported by the record. **See In re C.D.R.**, **supra** at 1215. Child has never had a true parent-child relationship with Mother and Father because, other than four hours each week, her daily physical and emotional needs have been met by the foster and proposed adoptive families. Mother and Father have provided no evidence of any bond beyond that which Child has with any other individuals she knows.

Parents have done nothing to address the safety concerns that resulted in the severe physical abuse to their other children and the aggravated circumstances that led to the immediate removal of Child from their custody upon birth. Finally, the court found that Ms. Gengarella credibly testified that Child's needs and welfare would best be served by the termination of Parents' parental rights. Again, this is another credibility determination we will not disturb, **see id.**, and we decline Mother's invitation to re-weigh the evidence where the court was "free to weigh the evidence presented during the termination proceedings as it saw fit." **In re Adoption of C.J.P.**, 114 A.3d 1046, 1053 (Pa. Super. 2015) (citation omitted).

Based on the foregoing, we conclude that the record supports the trial court's conclusion that the termination of Mother and Father's parental rights would best serve the developmental, physical and emotional needs and welfare of Child. **See In re J.M.**, **supra** at 324.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/2020

- 15 -